We'll turn to the first case on the argument calendar, case 24-6795, Panda versus Bondi. Good morning and welcome back. Good morning. Yes, I was here on Monday. It's a pleasure to be able to stand before the same panel twice in one week. May it please the court, Aaron Vasey, on behalf of the petitioners, I'd like to save two minutes of my time for rebuttal and I'll keep an eye on that clock. I do notice that counsel for the respondents, at least not on my screen. Yes, let's make sure counsel for the government can hear us. Okay. Okay, good. Thank you, sir. So this case centers on whether substantial evidence supports the immigration judge's conclusion that the petitioner did not suffer past persecution and did not demonstrate an objectively reasonable fear of future persecution. This case is unique because the I.J. found the petitioner credible, yet rejected a number of the petitioner's core factual claims without reason, such that multiple parts of the I.J.'s decision are not supported by substantial evidence. Once we rectify this issue, we're left with a record that I think compels the conclusion that the petitioners have both suffered past persecution and demonstrated an objectively well-founded fear. Now, I'm sorry, I didn't get the last. He suffered past persecution and? And that they've demonstrated an objectively reasonable fear of future persecution in Angola. Now, I want to highlight the most egregious examples of the I.J. rejecting facts in this manner and also explain how this issue spills over into other legal findings made by both the I.J. and the agency. First, the record here clearly demonstrates the petitioner escaped from police custody and that he lived in hiding afterwards until he left the country of Angola. These facts are important because they directly relate to whether the Angolan government had a continuing interest in the petitioner after his escape and whether the harm his family suffered after his escape was related to the problems he was having around the election. In his decision, the I.J. does not grapple with the evidence in the record that supports the petitioner's account of events. Here, this is not a single sentence in the petitioner's testimony that where he says that he escaped. We have large swaths of testimony where the petitioner provides detailed accounts how this escape plan came to be. How his wife, through her personal connection to the police chief, obtained information that the petitioner was at a higher risk of being killed after he hadn't been released from custody as he had during his prior arrests. The petitioner also describes the escape itself in detail. How, in the dead of night, two police officers escorted him wordlessly out of his cell into a police vehicle where they escorted him to a location of his choosing. When police officers dropped the petition off, they told him not to go outside. All these are indications that this is not a standard release from police custody and none of this is addressed by the I.J. or the agency. Instead, the I.J. simply states that because two police officers were involved in the escape, the Angolan government must have known about it and therefore must also have known about the petitioner. So these are facts that the agency should have considered in connection with the past persecution? Correct. Let me ask you this, how do they change the way in which we would look at past persecution if they were to be included? Understood. This fact is important because it explains how there's a clear connecting line between all the petitioner's problems around the election and the harm that his family suffered after this escape. In the I.J.'s and the BIA's analysis, they refused to consider the harm to these other family members. They see this as an isolated incident that, although unfortunate, has no connection to any of the other problems the petitioner faced. Because both the I.J. and the BIA failed to consider this harm, they both concluded that the petitioner hadn't suffered past persecution and had no well-founded fear of future persecution. Again, once we accept that the record compels the petitioner's account of events, I think there's a clear connecting line between those two things. So if we were to agree with you, that would be legal error on the part of the agency, is that correct? It could be, your honor. I think, again... Oh, I mean, what is it? Well, it's a factual issue. So the I.J., I think, makes a factual conclusion that's not supported by substantial evidence. That factual... And that's one way to describe it. I guess another way to describe it is just not considering evidence. That's another way to consider it, too. That's what I thought. And this is why this is a mixed question of law and fact. These facts affect directly the I.J. and the agency's conclusion or, I guess, analysis of past persecution. So what's the appropriate remedy to, if we agree with what you're saying, to let the I.J. consider this again? I think the record, again, compels the conclusion that the petitioner suffered past persecution. I would ask the court to make that finding and the remand of the agency to make further findings about the other elements of asylum. So the BIA, for example, didn't reach nexus. That's an issue that still needs to be addressed. The only problem is if we were to say that it was legal error, we have to tell the agency that they made a legal error and we need to correct it and say, do this correctly. I think it's both a legal error and a factual error. Is there anything else in the record that would support finding of past persecution? Um, yes, I think there's other facts in the petitioner's past that were glossed over by the I.J. and the agency. So I want to zoom out and look at the bigger picture here. All the harm in this case takes place within a context of political turmoil in Angola between the MPLA, which controls the government, and the UNITA political party. This court is consistently held that the context matters and can make the difference in the persecution analysis if there's objective evidence that individuals like the petitioner are being singled out for persecution. The petitioner in this case was a high level UNITA activist. He was organizing protests, he was leading groups around ahead of the elections, and he's suffered past harm that one would expect for someone in this in this context. He testified that he'd been arrested multiple times. The wife's sworn statement in this case actually said that he was, quote, arrested whenever protests took place. He testified that he'd suffered physical harm in the past that resulted in scars on his body. And he said that this harm didn't motivate him to leave the country because at the time he was still hopeful. Here we have a petitioner that, you know, is politically active because he wants to enact change in his country. He's now looking for an excuse to to flee and seek asylum here in the United States. This is harm that the IJ didn't consider. The BIA did consider it, but it minimized the harm because the petitioner stated that it didn't, it wasn't a factor in his final decision to actually flee the country for his own safety. In addition to that past harm, we have the threats that the petitioner received around the election. So these are threats made by a group of people, so both police officers and MPLA members. The threat was made to the petitioner while he was part of a group, but the petitioner testified that he was leading this group, right? The record also demonstrates that that threat was carried through. Just a few days later, the police arrived at the petitioner's home to arbitrarily arrest him and detain him for 10 days. And then I think this court does need to consider the harm to these family members after this escape, right? The petitioner escaped from police custody just a few days later. Individuals show up at the petitioner's home looking for him. These are individuals associated with the MPLA party, the same party that controls the government, that before the election took place. I think all of this, well, this harm to the family members was severe. So the petitioner's wife was beaten. She was threatened. The petitioner's infant child, one year old, was locked in a freezer to pressure the petitioner's spouse to disclose his location. And all this did have an effect on the petitioner himself, even though he wasn't present when this harm took place. The petitioner testified that when he learned about this attack on his family members, what he wanted to do was turn himself into the authorities. Even though he knew that that would result in his death, he wanted to do anything that he could to protect his family members from further harm. I think all of that together and the country condition evidence compels the conclusion of past persecution. I also want to highlight additional facts about the attack at the family's home that makes it clear that there's a connection between that harm and the other problems that petitioner had. Again, proximity and time. The petitioner escaped from police custody, and then just four days later, these individuals arrived at the home associated with the MPLA party. I see that I'm running out of time. Before I yield my time, I just want to address the respondents' argument that we've waived certain challenges to the IJ's conclusions about how country conditions in Angola have evolved. We're here because the petitioner's agency's finding that he hasn't demonstrated a well-founded fear of future persecution. Country condition evidence is a necessary part of that legal analysis, and in the petitioner's opening brief, we repeatedly cite to country condition evidence when talking about past persecution and future persecution. Here, we're directing the court to country condition evidence in the record that directly conflicts with the IJ's brief assessment of country conditions in Angola. This is something that both the IJ and the BI acknowledged was mixed. There is evidence of police abuse, of impunity, of political prisoners, but there also is evidence that the Angolan government is taking some steps to mitigate them. Okay, we'll put two minutes on the clock when you come back. Thank you. Okay, we'll hear now from the Attorney General. Hello. May it please the court, John Stanton for the Attorney General. I hope I'm clear, okay? You are, and good morning, sir, or good afternoon to you. Hello. Just very, very briefly, in our answering brief, we charged that petitioner's claim for reversal regarding his claim for the protection of the Convention Against Torture was functionally undeveloped. In his reply brief, he said absolutely nothing in response. In his oral argument, he says nothing in response. So as far as we're concerned, the CAC claim has been undisputed. I hope the court received our Rule 28J letter that we submitted on Wednesday afternoon regarding the Supreme Court's recent decision that held that substantial evidence review applies to all infancy findings regarding past persecution. That's essentially what we're fighting about. Petitioner's counsel basically re-argues the facts, but the substantial evidence reviews, so long as the agency was reasonable. Well, how about the argument that really the IJ and BIA decisions are providing a more sanitized account of petitioner's release or escape from detention and the time he spent in hiding? Well, we're not sure if he spent time in hiding. He was living with his pastor. He never claimed that he used the word, he did not use the word hiding. The pastor did not use the word hiding. He lived with the pastor. And besides everything else, the police knew where he was. Didn't he say he was told not to go outside? I don't recall that. But even if he weren't hiding, I mean, the police never charged him with any particular crime. So, I mean, it seems incongruous for the police to, like, drop him off someplace and not do anything about him. Isn't the argument that, you know, his wife managed seemingly through a bribe to get the petitioner released from custody in the middle of the night, and he was then taken to the pastor's house? And I mean, it's not clear to me that the IJ and BIA fully grappled with the import of what he was claiming. How do you respond to that? Well, I mean, as I said before, I mean, the government has not shown any continued interest in him. And to be honest, I mean, while the agency didn't actually make any nexus findings, it seems pretty clear that he was arrested in connection with an investigation for arson, as opposed to any political activities. So, I mean, the election already happened in August 2022. Shortly after that, the MPLA building was firebombed or lit on fire intentionally by arson. The police, for whatever reason, thought he had something to do with it. So, I mean, as we said in a brief, it's perfectly legitimate for governments to, like, conduct investigations, including holding suspects who are accused of bona fide crimes. Right, but I mean, why was he then released in the middle of the night, you know, under the circumstances that he claims? Well, at least in a strict sense of the law, I mean, it's, well, according to the petitioner, I mean, like, his wife was the hairstylist of the police chief's wife. They probably talked. We don't know why exactly it happened then. It's certainly possible they were intending to release him and they dropped him off at the pastor's house as a favor to him to, like, avoid any potential harassment from the MPLA. No, I mean, I guess this is the issue with just the record. Like, the record, there is testimony from him that he was at risk. That's what he claims prompted his wife to come and use this connection she had. And she says the same thing. And I guess the question is, is that sufficiently accounted for in the agency decision? I believe so. I mean, like, there's a presumption that the police, the agency considered all the evidence. I mean, I believe the board discussed that exact, I mean, incident in its opinion. So, it was, in fact, considered the fact that the agency didn't view the evidence in the same way that petitioner would have preferred, does not show that the record compels reversal. I mean, that's what substantial evidence review is all about, so long as... Mr. Stanton, may I ask you a question? Sure, of course. You would agree, wouldn't you, that if we were to conclude that the agency did not fully considered all the material facts in the case, that that would be legal error, is that correct? I mean, if a petitioner could show that the agency ignored or did not consider evidence under this court's precedent in the Lopez case, then, yes, I would agree it would be legal error. Then the remedy would be to remand it back to the agency so they can consider all the evidence, isn't that correct? That would be the usual remedy, yes, Your Honor, yes. Then at that point, the whole notion or the idea that substantial evidence review, as we now are required to do, would then kick in, is that correct? Well, I'm not sure I understand Your Honor's question. Under Oriana, the Supreme Court's recent case that you referred to a few minutes ago, past persecution is reviewed for substantial evidence. Yes. Right? Yes. Okay, but that only makes sense to me if the record before us has been fully considered by the board, right? Yes, yes, I agree with that, yes. So, if we were to determine or we were to agree with the petitioner that certain material facts were not properly considered by the board or the agency, then the remedy would be to send it back, tell them to consider those facts, and then we'll take it from there, correct? Yes, consider those facts and probably while they're out, address some of the other elements for asylum as well, like Lexis relocation, things of that nature. So, I would agree that would be the remedy. But again, we don't agree that that's what happened here. Right, I understand. We believe the... I understand that. Yeah, okay. All right, and with respect to the incident with the wife and children, I mean, again, very, very unfortunate, but I mean, this court's process makes clear that ordinarily harm to friends and family ordinarily are not considered persecution to the asylum applicant unless it creates a pattern of persecution closely tied to the applicant. Well, I don't know that the harm to the family has to create the pattern. I think that the harm has to be part of the pattern, right? I mean, so... So, I think the argument here would be, well, it was part of a pattern considering that it it was four days after he was released, and then people came to his wife's house and assaulted her trying to find out where he was living, right? So that, I mean, the BIA referred to this as isolated, but I'm not sure that really is consistent with the record. Well, I mean, like the word create does appear in this court's opinions. I know in the Sharma decision that you wrote, I mean, said it had to be part of a pattern of persecution. But other, I mean, the Arienta, I'm blanking on the name, the 1997 case said it has to create the pattern, but it was isolated. I mean, nothing else happened to the wife or family and daughter. They relocated to another town. Petitioner says she was in hiding, but there's, I mean, based on what? And just moving to another town is not... I think maybe based on being assaulted and having the child assaulted would be the reason. But the child was not harmed. The child was placed either in a freezer or a closet. But the record indicates the child was not set for any physical harm. I don't know if they were gentle with her or not, but I mean, but the child was not harmed, not assaulted. Mr. Stanton, I'd like to ask you another question about the record. And when I was looking over this, as I recall, the wife got involved in negotiating her connection with the chief of police and whatnot to help get him released. And I recall reading that the police chief told her that she may not see Panda again. And then later, the pastor tells her also in his declaration, he said that Panda stayed with him because the police wanted to kill Panda. I mean, that struck me as like, that struck me as like implied threats of death. I mean, I mean, I mean, it just seems, it seems incongruent that the police would want to kill him after they dropped him off someplace. It seems like there are much easier ways to do that. I mean, they have the opportunity to harm him, they did not. So I mean- It's not that the police wanted to kill him, it's that the other side wanted to kill him. Okay, well, I mean, that's, to the extent Judge Bress was talking about a pattern, I mean, that's a totally different pattern then. I mean, so I would think the pattern has to come from the same source of harm. Some of the cases that we cited in our brief, finding a pattern of persecution, the source of harm is usually the same, either it's the same gang or the government. It's not, I mean, it's not the government plus, I mean, thugs. So I mean, it's, I would say that's an entirely different pattern. To the extent it's a pattern at all, it's only one incident. So I tried to find a situation where this court has held that one incident does not create a pattern in the persecution context. The court has made that point in other contexts, constructed notice, delivered indifference, but it hasn't made it in persecution. But I mean, we think pattern has to mean something. Like there's just not a pattern of a persecution based on the MPLA against Petitioner on this record. I mean, they may have been angry at him because they suspected that he was involved in the contact with him or look for him or look for the wife ever since the September 22 incident. And so, I mean, I just don't think there's a pattern here. The police don't seem to care about him. He left the country without any issues with the assistance of the police chief. I mean, no one's really looking to kill this guy. Okay, thank you. All right. We've let you go a little over. So I want to thank you very much for your presentation. And we'll hear now from Mr. Basie. Yeah. Thank you, your honors. I just want to highlight a few things to address the respondent's argument. The petitioner did say that he was living in hiding with the pastor. He testified that no one else knew where he was. If you also check the pastor's sworn statement, it suggests that he was in hiding, that he was there for his protection because people wanted to kill him as your honor pointed out. I also want to highlight the country condition evidence in the long history of this conflict between UNITA and MPLA. This conflict dates back to the country's independence in 1974. Since then, the MPLA has controlled the government and UNITA has been the primary opposition party. I think it's ridiculous to say that this conflict has only now recently resolved itself. The respondent also minimizes other instances of harm, especially when talking about the petitioner's family members. The petitioner's infant child was harmed. And there's objective evidence in the record about that on page 185. We have a- What's the extent of the harm? The extent of the harm, I think, was limited to the child being forced into this freezer or closet to pressure the petitioner's spouse to reveal the location. And so the injuries are commensurate with that. So the medical report just notes bruising and body weakness. But the petitioner's spouse and his child were at the hospital for two days after this attack. I think this harm is severe. I also want to point out that the petitioner received threats before the election from a group, a mixed group of both police officers and MPLA members. So there's already evidence in the record that these two, I guess, groups, if we want to characterize them as different groups, are acting together to carry out the same kind of pattern of persecution. The attackers at the home were also MPLA members. So, again, I think the record really does compel a finding of past persecution. That's what we'd ask the court to do today. Thank you. Thanks to both counsel for the briefing and argument. The case is submitted.
judges: PAEZ, BEA, BRESS